## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## ROANOKE DIVISION

| | | |
|---|---|---|
| IN RE: | ) | **CHAPTER 7** |
| | ) | |
| **ROBERT HUNDLEY ALMOND, JR.,** | ) | |
| | ) | |
| | ) | **CASE NO. 05-70581** |
| | ) | |
| **DEBTOR** | ) | |

## MEMORANDUM DECISION

The matter before the Court is the United States Trustee's Motion to Dismiss Pursuant to 11 U.S.C. § 707(b) filed April 28, 2005 in which the United States Trustee alleges that the Debtor, Robert Hundley Almond, Jr., understated his and his non-filing spouse's joint income on Schedule I "based upon a comparison of their combined earnings for 2002, 2003 and 2004." (Mot. Dismiss 5.)  Had their income been accurately reported, the Motion asserts, and the couple "contributed most of . . . their net income less the expenses listed on Schedule J to a chapter 13 plan, [the Debtor] would be able to repay a substantial portion of his unsecured debt in less than 36 months." (Mot. Dismiss 4.) This Chapter 7 case was filed on February 18, 2005 and therefore this case is controlled by the law in effect prior to the adoption of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 (BAPCPA).  This matter was set for trial and heard on January 24, 2006.  The matter has been fully briefed by the parties and is now ready for decision.  For the reasons stated below, the Court will grant the United States Trustee's Motion.

### FINDINGS OF FACT

Federal Rule of Bankruptcy Procedure 1017(e)(1) requires the United States Trustee with regard to a motion to dismiss for alleged substantial abuse to "set forth in the motion all matters to be submitted to the court for its consideration at the hearing." The matters relied upon by the United States Trustee may be summarized as follows. The Debtor understated the total household income listed on Schedule I based upon a comparison of such income with his and his wife's adjusted gross income as reported on their tax returns for 2002, 2003 and 2004. On Schedule I, the Debtor reported a gross monthly income of $3,326.16 and Mrs. Almond's gross monthly income is reported as $5,715.23, an aggregate sum of $9,041.39. According to their tax returns, the Debtor and his non-filing spouse had adjusted gross income of $126,615 in 2002 ($10,551 per month), $129,075 in 2003 ($10,756 per month), and $141,229 in 2004 ($11,769 per month). It is claimed that the Debtor has the ability to pay "a substantial portion of his unsecured debt in less than 36 months." (Mot. Dismiss 4.) The Debtor's bankruptcy filing was not precipitated by any calamity, litigation or repossession. Mr. and Mrs. Almond are asserted to have lived beyond their means as evidenced by the Debtor's scheduled unsecured debts totaling $48,942.06, comprised primarily of revolving credit through credit cards and charge accounts. The Debtor is alleged to have incurred consumer debt at a time when it was clear that he was not able to service his existing debts.

The Debtor is married and the couple have one elementary school aged child who lives with them. Prior to filing bankruptcy, both the Debtor and his wife deposited their income into a joint account. The Debtor paid all expenses, regardless if joint or separate obligation, out of this joint account. After filing bankruptcy, the Debtor began depositing his paychecks in a separate account in an effort to track his money. However, the separate account is used in the

same manner as the joint account. Despite their shared finances, Mrs. Almond chose not to file a joint bankruptcy petition with her husband because she feared she would lose her job and tarnish her reputation in the community.

The Debtor is the Director of Housekeeping at Richfield Recovery and Care Center. Mrs. Almond is a sales consultant for an insurance company and her income has been considerably more than his. Both the Debtor and his spouse have been steadily employed in the past. Mr. Almond has been employed at Richfield since 2001 and Mrs. Almond has been employed by the same company for over twenty years. On the Statement of Financial Affairs, the Debtor reported his 2004 gross wages as $40,909.41 and his 2003 gross wages as $36,298.69. The Debtor and his non-filing spouse had an adjusted gross income of $141,229 per their 2004 federal income tax return and $129,075 reported on their 2003 federal income tax return. On Schedule I the Debtor represented that he had gross monthly income of $3,326.16, which after payroll deductions of $824.28 left a net disposable income of $2,501.88  per month. The Debtor reported his spouse had a gross monthly income of $5,715.23, which after payroll deductions of $2,289.61[1] left a net disposable income of $3,425.62. Against a combined monthly income of $5,927.50, Mr. Almond reported in Schedule J  $6,684.00 in average monthly living expenses, including a $1,374.00 monthly first mortgage payment, a $420.00 monthly payment on an automobile, a $400.00 monthly payment on a second mortgage, a combined $933.00 monthly payment on various credit cards in his wife's name[2], $175.00 per month for miscellaneous

---

[1] Among these deductions is Mrs. Almond's $110.91 per month contribution to her "401K" retirement account which has not been challenged by the United States Trustee in his calculations determining the couple's household income available to pay creditors.

[2] The Exhibit to Schedule J incorrectly lists two credit cards as Mrs. Almond's individual credit cards. First, a $70.00 monthly payment on Mrs. Almond's Citifinancial credit card. This

personal expenses, $1,000.00 per month for groceries[3] and $150.00 per month for his wife's cosmetics, hair and nails.

The schedules reported that the Debtor and his non-filing spouse owned real estate valued at $260,000.00 as joint tenants with a right of survivorship and subject to two mortgages totaling $255,800.00.[4] The Debtor reported an interest in personal property totaling $21,361.40[5], all of which was claimed as exempt except for $762.00 of the Debtor's interest in savings accounts designated for his child's education valued at $3,762.00; $19.00 of the Debtor's interest in a life insurance policy on the life of his daughter valued at $20.00; $1,200.00 of the Debtor's interest in a 2001 Jeep Cherokee valued at $4,500 and $10,999.00 in a 2002 Honda Accord valued at $11,000.

Aside from the mortgages, the Debtor reported secured debt totaling $12,969.85[6]

---

credit card is listed on Schedule D as a joint debt. The testimony and other evidence introduced at trial were that this is a joint debt. Second, a $98.00 monthly payment on Mrs. Almond's BB&T credit card. This credit card is listed on Schedule F as a joint unsecured debt. The testimony at trial was consistent with this credit card being a joint debt.

[3] Exhibit to Schedule J provides $1,000.00 per month for groceries, including food, cleaning supplies, paper products, school lunches, eating out and work lunches for the Debtor and his wife. The United States Trustee has not challenged this amount or indeed any of the Almonds' living expenses listed on Schedule J.

[4] The parties stipulated that the Debtor's residence was subject to a first deed of trust in the amount of $191,000 and a second deed of trust in the amount of $64,800.

[5] The parties stipulated that "[a]t the time this case was commenced, Mr. Almond owned an interest in personal property with a total value of $21,361.40." The Court notes that this agreed amount is not the amount reported on amended Schedule B, which was filed on March 21, 2005. Amended Schedule B provides that the Debtor owned an interest in personal property with a total value of $28,570.40.

[6] Bank One's claim of $1,201.30, secured by a purchase money security interest in a camera and camcorder. Citifinancial's claim of $8,622.47, secured by a purchase money security interest in carpet and tile. A $3,146.08 claim held by Citifinancial, secured by a purchase money security interest in an air conditioner. The Debtor filed a Statement of Intention in which he

on Schedule D, comprised of purchase money security interests in a camera, camcorder, carpet, tile and an air conditioner. Citifinancial's claim of $8,622.47, secured by a purchase money security interest in carpet and tile, is listed as a joint debt on Schedule D. However, both the Debtor and his wife testified that the debt was in Mrs. Almond's name only and thus was her personal debt. On Schedule J, the Debtor lists as a household expense a $420.00 monthly payment on an automobile, which he testified was for a loan he and his wife had obtained to purchase her Honda Accord which would be paid off in three years. Although this obligation was not originally listed in the Debtor's schedules, it was subsequently added. The Debtor reported unsecured claims totaling $48, 942.06[7], all of which is credit card debt. The parties have stipulated that Mr. Almond's debts are consumer debts within the meaning of 11 U.S.C. § 707(b) and that his bankruptcy petition was not filed because of sudden illness, calamity, disability or unemployment.

　　　　The United States Trustee urges that this case is one of substantial abuse because he asserts the Debtor understated in Schedule I his spouse's actual monthly income by $504.03 and that the Debtor has the ability to pay a substantial portion of his unsecured debt in a thirty-six month Chapter 13 plan. To arrive at Mrs. Almond's monthly income at the time of filing, the United States Trustee multiplied her gross earnings as reflected on her paycheck stub by twenty-six, which results in a yearly figure of $74,631.18. The yearly figure is then divided by twelve to

---

indicated his plan to continue making the payments upon all three of these obligations. The payment on the Bank One obligation is not listed on the Exhibit to Schedule J as a household expense.

　　[7] Included in these obligations is a duplication of the Bank One obligation of Mr. Almond in the amount of $1,201.30 listed in Schedule D and indicated to be secured by a camera and camcorder.

arrive at a monthly income of $6,219.26. The figure compares with Schedule I gross monthly

income reported for Mrs. Almond of $5,715.23. The payroll deductions as provided on the

paycheck stubs were then subtracted from her gross monthly income to arrive at a net monthly

income of $4,599.37. After adding Mrs. Almond's monthly income to Mr. Almond's scheduled

income and deducting the scheduled monthly expenses reported on Schedule J[8], the United States

Trustee contends that Mr. Almond has $417.25 per month to contribute to a Chapter 13 plan. In

a thirty-six month Chapter 13 plan, the United States Trustee calculates that Mr. Almond will pay

27% of his unsecured debt.

The United States Trustee further argues that the Debtor and his spouse have lived

beyond their means as evidenced by the Debtor's more than $44,000.00 of individual credit card

debt, his wife's approximate $30,000.00 of individual credit card debt, and the couple's

approximate $8,000.00 of joint credit card debt. Mr. Almond and his wife have two joint credit

cards, a Citifinancial credit card with an approximate balance of $3,146.08 and a minimum

monthly payment of $70.00,[9] and a BB&T credit card with an estimated balance of $4,921.53

and a minimum monthly payment of $98.00.[10] Mr. Almond has continued to make the minimum

monthly payments on the couple's joint credit cards since he filed bankruptcy. Mr. Almond

testified that he and his wife have been making the minimum monthly payments on their credit

---

[8]On Schedule J, the Debtor reported $6,684.00 in average monthly living expenses, which included a combined $933.00 monthly payment on various credit cards in his wife's name.

[9] The credit card is listed on Schedule D as a joint debt, but is provided on the Exhibit to Schedule J as Mrs. Almond's credit card. The testimony and other evidence introduced at trial were that this is a joint debt.

[10]This credit card is listed on Schedule F as a joint unsecured debt, but the monthly payment is listed on the Exhibit to Schedule J as Mrs. Almond's credit card. The testimony at trial was consistent with this credit card being a joint debt.

card debt for the last five years. Prior to filing bankruptcy, Mr. Almond had the following eight individual credit cards with balances totaling $44,020.53:[11]

| Credit Card | Balance |
|---|---|
| Bank One | $1,201.30[12] |
| Capital One | $3,895.99 |
| Chevron/Texaco | $1,288.34 |
| Discover | $10,946.50 |
| Home Depot | $7,000.97 |
| Lowes | $1,197.61 |
| Sears Gold Mastercard | $14,369.96 |
| Wachovia | $4,119.86 |
| **Total** | **$44,020.53** |

Adding to this sum of $44,020.53 for his individual credit obligations the indicated filing date balance of $4,921.53 for the joint BB&T credit card yields a total unsecured debt for which Mr. Almond is responsible of $48,942.06. The Debtor testified that the minimum monthly payments on his individual credit cards totaled $1,000.00 per month. Since filing bankruptcy, the Debtor has stopped making the minimum monthly payment on his credit cards and is using that money to pay family expenses and his wife's credit card debt. Mrs. Almond testified that she has eight individual credit cards with the following balances and minimum monthly payments.

---

[11] The Debtor's individual credit cards are listed on Schedule F as well as a joint BB&T credit card.

[12] The Debtor filed a Statement of Intention in which he indicated his plan to continue making the payments on this obligation. The payment on this obligation is not listed on the Exhibit to Schedule J as a household expense.

| Credit Card | Estimated Balance | Minimum Monthly Payment |
|---|---|---|
| Sears | $4,000.00 | $130.00 |
| Wachovia Visa | $5,000.00 | $130.00 |
| Ann Taylor Loft | $2,000.00 | $99.00 |
| Belk | $3,000.00 | $130.00 |
| Grand Furniture | $6,500.00 | $221.00 |
| Hechts | $2,000.00 | $92.000 |
| Bank of America | $1,500.00 | $88.00 |
| Citifinancial | $6,000.00 | $224.00 |
| **Total** | **$30,000.00** | **$1,114.00** |

Since Mr. Almond filed bankruptcy, the couple have continued to make the minimum monthly payments on her individual credit cards. Both the Debtor and his spouse testified that the family made several adjustments to expenses after the Debtor filed for bankruptcy, including reducing the amount spent on clothing, gifts[13], dry cleaning, phone service and eating at restaurants. Additionally, the Debtor stopped contributing to his retirement plan.

Despite making only the minimum monthly payments on their credit cards, the Debtor and his spouse purchased a new home in 2003 for $244,000. The Debtor testified that he and his wife made approximately $50,000 from the sale of their old house, $10,000 of which was used to pay credit card debt. The remainder of the sale proceeds were used to put a roof on the new house, pay off the secured loan on the 2001 Jeep Cherokee, and make a down payment on the new home[14]. Shortly after moving into their new home, the couple purchased dining room

---

[13] Mrs. Almond testified that she helps her sister in terms of gifts ranging from $500 to $1,000 per year.

[14] There was conflicting testimony regarding the down payment on the new house. The Debtor testified on direct examination by the United States Trustee that a portion of the $50,000

furniture on credit from Grand Furniture for approximately $6,000.[15]

The Debtor offers two explanations for the difference between Mrs. Almond's scheduled income[16] and what the United States Trustee claims to be her actual income. First, Mrs. Almond changed jobs in February 2005. At the time the Debtor completed Schedule I, he was estimating what his wife's income would be in the new position. At trial, Mrs. Almond testified that she became aware of the availability of the new position in October 2004. At this time, Mrs. Almond understood that although the base salary of the new job was higher than her current position, the total compensation would be less in the new job because fewer bonuses were available in the new position.[17] Despite the decrease in pay, Mrs. Almond applied for the new job in January 2005. At the end of that month, Mrs. Almond was notified that she would start the new job effective February 1, 2005 and be required to work both her old job and the new position until May 31, 2005. Mrs. Almond's decision to apply for the new job was based on her desire to spend more time with her daughter. Mrs. Almond testified she worked sixty to seventy hours per week in her old position and just thirty hours a week in the new position. To compensate for his wife's change to a lower paying position, the Debtor obtained a part-time job working ten to twelve hours per week and earning a weekly net pay ranging from $70 to $80.

Second, to determine his wife's gross monthly income for Schedule I, the Debtor

---

received from the sale of their home was used a down payment on the new house. During the Court's examination of the Debtor, he testified that $40,000 of the second mortgage was used to make a down payment on the house.

[15] This debt is in Mrs. Almond's name only and is listed in the chart above.

[16] The Debtor did not indicate in his testimony at trial how he arrived at the gross monthly figure of $5,715.23 contained in Schedule I.

[17] During 2005, Mrs. Almond received three bonuses in the new position ranging from $500 to $1,000 each.

multiplied her bi-weekly gross income in the new position by 2 instead of multiplying it by

2.165. (Debtor's Reply Br. 9.)  The Debtor's calculation resulted in omitting two weeks' income

from his wife's gross monthly income; thus understating her gross monthly income by $500.00.

(Debtor's Br. 9.) The Debtor argues that his error was not noticeable when he completed the

schedules because his wife had just started her new job and that his error is not significant given

his scheduled expenses.

The United States Trustee has filed his Motion to Dismiss on several grounds,

centering around allegations that the Debtor understated his household income by $504.03 and

that the Debtor and his non-filing spouse have a long history of incurring consumer debt well

beyond their ability to repay.

*Ability to pay*

The United States Trustee argues that Mrs. Almond's income must be considered

in the substantial abuse analysis even though she did not file a joint bankruptcy petition with her

husband.  As discussed above, the United States Trustee calculates that the Debtor has $417.25

per month to fund a thirty-six month Chapter 13 plan.

While this Court does not doubt, as contended by the United States Trustee, that it

ought to consider Mrs. Almond's income in order to get a clear picture of the Debtor's actual

financial circumstances and ability to pay, the Court does have to respect the fact that such

spouse is not seeking bankruptcy relief and cannot be compelled to devote her disposable income

to the benefit of the Debtor's creditors.  The United States Trustee's determination that the

Debtor can contribute $417.25 per month to a Chapter 13 plan is based on adding Mrs. Almond's

income to the Debtor's income.  The Court does not believe this is the proper way to calculate

the amount of income available to the Debtor to fund a Chapter 13 plan under the circumstances

-10-

presented in this case.

In view of the nature of the arrangement between Mr. and Mrs. Almond to pay their expenses, which involves aggregating their incomes and paying the bills from that combined amount as best they can, it seems that Mr. Almond should be responsible for paying a pro rata share of the joint obligations and living expenses based on his contribution to the couple's total net income. Per Schedule J, the Debtor reported $6,684.00 monthly living expenses. Several obligations are listed on the Exhibit to Schedule J as Mrs. Almond's separate obligation and/or expense. The Court finds that two of such obligations were improperly characterized as Mrs. Almond's separate debt. First, the Citifinancial credit card secured by an air conditioner is listed on Schedule D as a joint debt. At trial, Mrs. Almond testified that she had an individual Citifinancial credit card with a minimum monthly payment of $224.00 and that only one of the Citifinancial credit cards listed on the Exhibit to Schedule J was her separate credit card. Accordingly, the Court finds that the Citifinancial credit card listed on the Exhibit to Schedule J with a $274.00 payment is Mrs. Almond's individual credit card and that the Citifinancial credit card with a $70.00 monthly payment is a joint obligation. Secondly, a BB&T credit card is listed as Mrs. Almond's individual credit card on the Exhibit to Schedule J. This credit card is listed on Schedule F as a joint unsecured debt. Further, Mrs. Almond testified that this credit card was in both her and her husband's name. Accordingly, the Court finds that the BB&T credit card listed on the Exhibit to Schedule J with a $98.00 monthly payment is a joint debt.

To determine the joint expenses and obligations which both Mr. and Mrs. Almond are responsible for paying, the Court subtracted the following obligations of Mrs. Almond from Schedule J and concluded that the couple has joint monthly living expenses and other obligations

-11-

totaling $5,919.00.

| Total Monthly Expenses per Schedule J | $6,684.00 |
|---|---|
| Mrs. Almond's Citifinancial Credit Card Monthly Payment | $ 274.00 |
| Mrs. Almond's Grand Home Credit Card Monthly Payment | $ 221.00 |
| Monthly Payments on Mrs. Almond's Belk, Hechts, Bank of America and Pottery Barn Credit Cards | $ 270.00 |
| Total Joint Expenses and Obligations | $5,919.00[18] |

The Debtor's scheduled income has not been disputed by the United States Trustee. Per Schedule I, the Debtor's net monthly income is $2,501.88. Debtor's counsel has admitted that the Debtor made an error in calculating his spouse's income, which resulted in understating her monthly income by $500.00. (Debtor's Br. 9.) The United States Trustee's calculations were performed with figures taken from Mrs. Almond's pay stubs and have not been specifically challenged by the Debtor. For the following calculations, the Court will use Mrs. Almond's net monthly income as calculated by the United States Trustee, which is $4,599.37. Mr. Almond contributes 35% of the net monthly income to the couple's total net monthly income.[19] As such, the Court finds that the Debtor is responsible for paying 35% of the joint monthly obligations and expenses, which total $5,919.00. Therefore, the Debtor's pro rata share of the joint monthly obligations and expenses is $2,071.65. Subtracting this amount from the

---

[18] The Court was initially of a mind to subtract also the $150.00 per month figure for Mrs. Almond's cosmetics, hair and nails as being properly chargeable solely against her income as a personal expense. It decided not to do so, however, after considering that the United States Trustee has not challenged this expense as a household expense deduction and that there is no basis in the evidence for the Court to find what level of expenditure related to personal appearance is appropriate for Mrs. Almond to produce even the reduced handsome salary which she earns.

[19] The couple's total net monthly income is $7,101.25. $2,501.88, Mr. Almond's net monthly income per Schedule I, is 35% of $7,101.25.

Debtor's net filing date monthly income of $2,501.88 results in the Debtor having $430.23 per month excess income. By contributing $430.23 per month to a thirty-six month Chapter 13 plan, the Debtor could pay, after allowing for a 10% expense factor, 28.48% of his scheduled unsecured debt.[20]

*Whether the Debtor incurred cash advances or made consumer purchases far in excess of his ability to pay*

There is no evidence that either the Debtor or his wife took cash advances on their credit cards. There is substantial evidence that they have made consumer purchases significantly beyond their ability to pay. Although the parties have only child and enjoy a very liberal income and have made no suggestion of any calamity which has resulted in their financial distress, for a number of years they have been making only the minimum required payments on their consumer credit obligations. Their financial problems appear to result solely from their overspending to support the lifestyle which they enjoy and the incurrence of consumer credit to make it possible. The Court finds that the Debtor together with his wife have incurred consumer obligations far beyond their ability to pay it upon the contractual terms.

---

[20] This calculation assumes the full payment of the joint secured obligations. It does not take in account the Bank One monthly payment for the account secured by the camera and camcorder. As previously noted, the amount of this debt is listed both in Schedule D as a secured obligation and Schedule F as an unsecured obligation. The monthly payment for this account is not disclosed in the evidence and the Court has disregarded it due to its relatively small balance ($1,201.30) and the income from Mr. Almond's post-petition part-time job from which, the Court assumes, Mr. Almond could contribute enough to pay this obligation as a secured debt in a Chapter 13 plan. In making the calculation of a 28.48% distribution to unsecured creditors, the Court has not taken into account the earnings from Mr. Almond's post-petition part-time employment on the rationale that the evidence does not disclose that such employment was in existence or prospect on the filing date. If it were taken into account, the possible distribution to his unsecured creditors in a Chapter 13 plan could be significantly greater.

*Excessive and unreasonable family budget*

While the United States Trustee has not challenged the expenses listed on Schedule J, he has questioned the reasonableness of devoting such a large portion of the family income to servicing Mrs. Almond's credit card debt. The United States Trustee contends that the couple has to struggle each month to find approximately $1,000 to make the minimum monthly payments on Mrs. Almond's credit cards. Based on their substantial joint income and the lack of any indicated reasons, such as, for example, major health expenses or loss of time from gainful employment, the Court finds that the Almonds have over-committed their incomes and therefore their family budget is excessive for a couple enjoying their station in life, especially taking into account Mrs. Almond's purely voluntary decision to seek a lower paying job with her employer allowing her greater family time.

*Accuracy of the Debtors' schedules*

The United States Trustee asserts that the inaccuracies in Schedule I with respect to Mrs. Almond's income are a basis for dismissing the Debtor's case regardless of whether the error was intentional or accidental. The Court finds no intent on the Debtor's part to mislead either his counsel or the Court with respect to the information contained in his bankruptcy schedules, but it does find that Mrs. Almond's gross income was understated by $504.03 per month below the actual figure of $6,219.26, an understatement of approximately 8% of the correct amount.[21]

---

[21] The Court observes, however, that Schedule I reported a $963.84 monthly deduction for insurance from Mrs. Almond's gross salary which compares with a monthly aggregate deduction of $159.29 indicated at trial. This discrepancy was not explained at trial, however, or relied upon by the United States Trustee in challenging the accuracy of the Debtor's schedules. Accordingly, it is given no weight in this Decision.

*Bad faith*

The United States Trustee concedes that the Debtor's conduct does not rise to the level of bad faith. However, he argues that Mr. Almond's creditors are being asked to forego repayment in order to service Mrs. Almond's debts, such circumstances support a finding of substantial abuse. The Court finds no bad faith on the part of Mr. Almond.


## CONCLUSIONS OF LAW

This Court has jurisdiction of this proceeding by virtue of the provisions of 28 U.S.C. §§ 1334(a) and 157(a) and the delegation made to this Court by Order from the District Court on July 24, 1984. A motion to dismiss for substantial abuse is a "core" bankruptcy matter pursuant to 28 U.S.C. § 157(b)(2)(A).

A court may dismiss a Chapter 7 bankruptcy case upon a motion by the United States Trustee if the case is filed by a debtor with primarily consumer debts and granting relief would be a substantial abuse of Chapter 7 provisions. 11 U.S.C. § 707(b). *Collier on Bankruptcy* points out that Congress was concerned with the abuse of consumer debt and that § 707(b) of the Code was adopted as "part of a package of consumer credit amendments" included in the Bankruptcy Amendments and Federal Judgeship Act of 1984. *6 Collier on Bankruptcy* ¶ 707.LH[2] (Alan N. Resnick & Henry J. Sommer eds., 15th ed. rev.). Section 707(b) only applies to an individual debtor whose debts are "primarily consumer debts." Rule 1017(e) of the Federal Rules of Bankruptcy Procedure, implementing this section, provides that the "United States [T]rustee shall set forth in the motion all matters to be submitted to the court for its consideration at the hearing." It is unmistakably clear that such motions are not to be readily

-15-

granted and that the onus is upon the United States Trustee to prove that the case is abusive, both by the quoted language in Rule 1017(e) and also by the last sentence in § 707(b), granting a presumption in favor of the debtor.

The Bankruptcy Code does not attempt to define "substantial abuse" and courts have struggled to apply this provision given the plethora of factual situations presented by debtors. In summary, Congress appears to have been concerned about persons who knowingly or recklessly live beyond their means, who live the good life using the resources of their creditors to do so and then choose to walk away from their debts even though they have the financial ability to pay them and although their income levels may have given them the access to the credit markets which have made their liberal lifestyles possible.[22]

The Fourth Circuit Court of Appeals has adopted a "totality of the circumstances" test in determining whether substantial abuse has occurred. *Green v. Staples (In re Green)*, 934 F.2d 568, 570 (4th Cir. 1991). In *Green*, the Court listed a number of factors to be considered:

> (1) Whether the bankruptcy petition was filed because of sudden illness, calamity, disability, or unemployment;
> (2) Whether the debtor incurred cash advances and made consumer purchases far in excess of his ability to repay;

---

[22] *Collier on Bankruptcy* points out that in enacting § 707(b),

> Congress rejected attempts by the consumer credit industry to permit creditors to move for dismissal of cases on the basis that the debtor had an ability to pay debts. It also rejected the idea that a case should be dismissed simply because a debtor could pay a "reasonable portion" of his or her debts (defined as 50%), as well as the use of a five year period to determine whether such portion could be paid. The resulting section 707(b) is thus more narrow than the provisions originally sought be the consumer credit industry and targeted only at debtors who can pay their debts without difficulty.

6 *Collier on Bankruptcy* ¶ 707.LH[4] (Alan N. Resnick & Henry J. Sommer eds., 15th ed. rev.).

(3) Whether the debtor's proposed family budget is excessive or unreasonable;
(4) Whether the debtor's schedules and statement of current income and expenses reasonably and accurately reflect the true financial condition; and
(5) Whether the petition was filed in good faith.

*Id.* at 572. The *Green* court further held that:

Exploring these factors, as well as the relation of the debtor's future income to his future necessary expenses, allows the court to determine more accurately whether the particular debtor's case exemplifies the real concern behind Section 707(b): abuse of the bankruptcy process by a debtor seeking to take unfair advantage of his creditors.

*Id.* The Court in *Green* further pointed out that a vast majority of circuit courts have held that the debtor's ability to repay is the primary factor to be considered. *Id.* District Judge Kiser of this District has recently analyzed *Green* in *In re Harrelson*, 323 B.R 176 (W.D. Va. 2005). This opinion offers a thorough recent analysis by a court to which an appeal from this Court lies detailing how a motion pursuant to § 707(b) for alleged substantial abuse ought to be determined. This Court will undertake, therefore, to apply the methodology of that decision in deciding the present Motion.

*Ability to repay*

In *Harrelson*, Judge Kiser emphasized that "the ability to repay, although not a dispositive factor, is the primary factor in determining substantial abuse." *Id.* at 179 (citing *Shaw v. U.S. Bankr. Adm'r*, 310 B.R. 538, 540 (M.D. N.C. 2004) and *In re Norris*, 225 B.R. 329, 331-32 (Bankr. E.D. Va. 1998)). Judge Kiser went on to note that *Green* requires courts to look at the totality of the circumstances.

A court may not dismiss debtors' ability to repay debts as an irrelevant factor. On the contrary, it is the primary factor in determining substantial abuse. . . . Courts have held that a debtor's ability to repay weighed in favor

-17-

of a substantial abuse finding when the debtors could only pay 29% and
47% of their unsecured debt over a period of three years.

*Id.* at 180 (citing *Shaw,* 310 B.R. at 540 and *Norris,* 225 B.R. at 332).  The *Green* opinion

expressly recognizes, however, that "solvency alone is not a sufficient basis for a finding that the

debtor has in fact substantially abused the provisions of Chapter 7." *Green,* 934 F.2d at 572.

The United States Trustee asserted that the combined income of the Debtor and

his non-filing spouse was such that the Debtor could pay 27% of his unsecured debt in a thirty-

six month Chapter 13 plan.  Based on the Finding of Fact made above, the Court found that the

Debtor could pay approximately 28.5% of such debt.  This is in the low range of what has been

considered an ability to repay one's debts.  Accordingly, this factor weighs against the Debtor,

but not dramatically.  It is certainly a much lower percentage than it appears Congress had in

mind when it enacted section 707(b).

*Petition filed as a result of a sudden illness, calamity, disability or unemployment*

The court in *Harrelson* held that this factor weighs in favor of dismissal when the

filing is not due to some "unforeseen tragedy." *Harrelson,* 323 B.R. at 178 (citing *Norris,* 225

B.R. at 333).  The parties stipulated that the bankruptcy petition was not filed because of sudden

illness, calamity, disability, or unemployment. Accordingly, this factor weighs in favor a

substantial abuse determination.

*Whether the Debtor incurred cash advances or made consumer purchases far in excess of his*
*ability to pay*

Case authority on this point varies widely.  In *In re Vansickel,* 309 B.R 189, 211-

12 (Bankr. E.D. Va. 2004), the court held that "relatively modest" debts including $28,000 in

-18-

unsecured debt did not weigh in favor of dismissal, holding that due to the statutory presumption

in favor of granting a debtor bankruptcy relief, the United States Trustee did not meet his burden

of proof in establishing substantial abuse. In *In re Norris*, 225 B.R. at 333-34, however, the court

held that this factor did weigh in favor of dismissal when the debtors incurred more than $90,000

of unsecured debt, lived in an expensive home, dined out, and utilized their 401(k) plans to create

a reserve fund for future expense. Additionally, another district court held this factor weighed in

favor of dismissal when the debtors purchased a $4,000 bedroom suite, spent $1,000 a month for

their daughter's college expenses, lived in a home they could not afford but were unwilling to

leave, and purchased two new cars. *Shaw*, 310 B.R. at 540-41.

   The facts here are not so dramatic. There is no indication of the purchase of

luxury vehicles or vacations or similar expenditures. There is no indication that the Almonds

have lived a lavish lifestyle, but somehow they have so lived that they have incurred consumer

debt so large in its total aspect that even though blessed with a very substantial joint income they

have been struggling for some time just to make contractually required minimum payments,

much less begin making significant headway in paying for the goods and services which they

have enjoyed at the invitation of their creditors. The Court has found that while there is no

evidence of having obtained cash advances on their credit cards, they have incurred consumer

debt significantly beyond their ability to pay for it. This factor then weighs in favor of granting

the Motion.

*Excessive and unreasonable family budget*

   The Court has made a Finding of Fact that based on their income and lack of

indications of any extraordinary demands upon that income other than the desire of the Debtor

and his wife to live well, their household expenditures are excessive, especially in light of Mrs.

Almond's decision to obtain a job which cuts back her hours of work considerably but also

materially reduces her income.

*Accuracy of the Debtors' schedules*

In his opinion in *Harrelson,* District Judge Kiser held that under the Fourth

Circuit's decision in *Green,* inaccuracy of bankruptcy schedules is a factor, to be weighed,

regardless of the Debtor's motive or intent to deceive, and therefore relevant. *Harrelson,* 323

B.R. at 179. The Court has found that there was a material understatement of Mrs. Almond's

income, albeit with no intent on the Debtor's part to mislead any party in interest. This factor

must be deemed, therefore, to weigh in favor of granting the Motion, although the Court under

the circumstances presented in this case does not give it much weight.

*Bad faith*

District Judge Ellis of the Eastern District of Virginia in *McDow v. Smith,* 295

B.R. 69 (E.D. Va. 2003), a case involving a motion to dismiss for "cause" under 11 U.S.C. §

707(a), stated generally that "a debtor's 'bad faith' or 'lack of good faith' is evidenced by the

debtor's *deliberate* acts or omissions that constitute a misuse or abuse of the provisions, purpose,

or spirit of the Bankruptcy Code." *Id.* at 74 (emphasis added). Of particular significance on this

point would be a finding of wrongdoing on the part of the debtor, either in the accumulation of

the debt or in the filing of the Chapter 7 petition. *Id.* at 82. Most cases resulting in a finding of

bad faith involve egregious factual situations wherein the debtor has accumulated massive

amounts of credit card debt with no intent to repay the debt, lives a lifestyle far above what he or

she could afford and/or intends to avoid a large single debt. *In re Zick,* 931 F.2d 1124, 1129 (6th

-20-

Cir. 1991); *see also In re Haddad*, 246 B.R. 27, 38 (Bankr. S.D. N.Y. 2000) (in addition to living

an extravagant lifestyle, debtor was not candid in disclosure requirements and attempted to claim

a wedding band as exempt while unmarried); *In re Ragan*, 171 B.R. 592, 596 (Bankr. N.D. Ohio

1994) (case dismissed under 707(b) after debtor withdrew more than $160,000 from IRA and

recklessly spent it all with little or no regard for obligations to creditors). The Court finds no

such indication of bad faith on the Debtor's part.

*Other factors*

The Court of Appeals's opinion in *Green* did not hold that the factors it

enumerated were exclusive or exhaustive. It adopted a "totality of circumstances" test which

called for consideration of factors "such as" the ones specifically listed. *Green,* 934 F.2d at 572;

*see also Vansickel,* 309 B.R. at 169 n.9 (stating that the *Green* list is illustrative rather than

exhaustive). The parties have not suggested other factors to be considered by the Court and it has

not identified any in its own review of the facts presented.

# DECISION

The situation presented here is an unusual one, particularly in that the finances of

the Debtor and Mrs. Almond are so completely intertwined but only one of them is actually

before the court seeking relief from the pressure of suffocating financial obligations.

Furthermore, at a time when this couple had been struggling with their financial obligations for

several years and only making minimum payments upon their various accounts, Mrs. Almond

decided to apply for a job within the same company which would pay her significantly less than

her previous income but would allow her more time at home to spend with the couple's daughter.

While such a decision is quite understandable on a personal desire basis, the only way that it even possibly could be accommodated, without her seeking bankruptcy relief, was for Mr. Almond to do so to the prejudice of his creditors, and/or for him to obtain additional income. He in fact is attempting to do both of those things, although not with the results needed to make up for the reduction in his wife's income. Simply put, the Almonds have been unwilling to live with the present consequences of their history of living beyond their liberal means. When the time has come to "pay the piper", they haven't wanted to pay. There is no indication that the Almonds have sought financial counseling, although their need for it is painfully apparent. While Mr. Almond's ability to pay his creditors some meaningful amount in a Chapter 13 case is in the very low range of the amounts approved by courts granting substantial abuse dismissal motions, it is within that range of what was expressly approved in *Harrelson. See* 323 B.R. at 180. The reason for the Almonds' financial problems seems to result entirely from their overuse and abuse of the consumer credit which has been made too readily available to them. This is precisely the concern which motivated Congress to enact § 707(b), which is only applicable when a majority of a bankruptcy debtor's debt is consumer in character. Based on the criteria which appellate courts have determined ought to be applied in dealing with substantial abuse motions, the Court concludes that the United States Trustee's Motion has been proven. Accordingly, by separate order the Court will grant the United States Trustee's Motion to Dismiss unless the Debtor within fifteen (15) days of the entry of the Court's contemporaneous order carrying out this Decision files a motion to convert his case to one under Chapter 13 of the Bankruptcy Code.

This 3rd day of April, 2006.

_____
UNITED STATES BANKRUPTCY JUDGE